Final case on calendar for argument today is Center for Community Action v. Federal Aviation Administration. Counsel for appellant please proceed. Good morning. One thing we are splitting our time with the Attorney General's office so the clerk asked that we note that for the court. And so okay so what is what's the split? 12 minutes for me and eight minutes for my colleague Ms. Chi. Madam clerk could you put 12 minutes on the clock please? All right counsel. May it please the court my name is Adrian Martinez from Earth Justice. I'm counsel for the Center for Community Action and Environmental Justice Sierra Club Teamsters Local 1932 and two residents Martha Romero and Shauna Saters who live near the project. I will be reserving five minutes for rebuttal. This case relates to San Bernardino California. This is the part of the country with some of the worst ozone pollution. It has many disadvantaged communities near the neighborhoods around the airport and these communities have suffered environmental harms associated with the freight industry despite the economic benefits of this industry. This project here is designed as a Southern California airport hub for Amazon, one of the largest freight corporations in the world. The project of this magnitude means round the clock airplanes taking off, many dirty diesel trucks coming into and out of this facility, and the project means thousands of pounds of pollution daily. And this is occurring in one of the worst air pollution basins in the country. And the project is also on an active super sun site and in close proximity to schools. Petitioners have established that the agency action here is arbitrary and capricious for three main reasons. They used an improper study area, they failed to properly analyze cumulative impacts, and they failed to assess properly assess whether this project will interfere with state and federal standards. Now it's important to understand that to prevail in this case, petitioners need to solely raise substantial questions whether a project may have a significant effect on the environment because no environmental impact statement was done here. And here, cleaner advocates have presented evidence showing that there will be a significant impact beyond just showing that there may be a significant impact. Now I want to dig into how courts determine significance. So courts look at context and intensity. I talked a little bit about the context here being in San Bernardino. I want to start with the general study area issue. First, petitioners argued that the FAA used too small of a study area here. And I think this is important because a study area forms the basis for analysis. And there were two study areas. There was a general study area, which was used for many of the impacts like traffic quality, and then there was a detailed study area, which was used for hazardous substance. Now in the general study area, it was a small area close to the airport, and it didn't take into account many of the impacts that would happen beyond that area related to this project. For example, the project noted that trucks were coming into and out of the ports of L.A. and Long Beach many miles away, and even the half of the trucks that would go to different areas were 27 plus to 60 miles away. And so the study area was too small to appropriately analyze the impacts of this project. Now I want to talk a little bit about... I have a question. How big was the general study area, and how big do you think it should have been? I mean, is it a number of acres or miles from the airport or miles from Long Beach or what? Yeah, and the FAA in their brief articulated that the general study area was approximately 11 square miles. Now this is an important issue because the FAA's guidance shows that for each impact area, you need to look at what the study area should be. So for some impacts, the area must may be much bigger. So for example, air quality is different than traffic, which is different than noise. The general study area is primarily based on noise analysis, and it doesn't reflect the differences of these environmental impacts and how they differ. Now I'd like to move on to the intensity factors. Now the Council on Environmental Quality has established 10 intensity factors. Petitioners focus on two. First, cumulative impacts, and second, whether the action threatens a violation of federal, state, and local laws. I'll start with the cumulative impacts. Impacts analysis was a paltry analysis. It consisted of a chart with very little information. In addition, there was a little bit larger narrative later on in the document that talked about the impacts. It didn't provide the quantitative information necessary or the detail necessary to understand how this project, in addition to those 26 projects, will potentially impact the environment. In addition, petitioners identified 80 projects that were ignored in the analysis that should have been analyzed. And then I want to shift. I actually have a question on the quantitative analysis. Weren't those projects considered as part of the traffic problem? So isn't that a quantitative analysis? Yeah, and the FAA claims to have done a traffic analysis, but I think the important point about this is NEPA didn't say do a cumulative impacts analysis for traffic. It said do a cumulative impacts analysis, which requires analysis for all the impact areas. So just because they did it for traffic means they needed to do it for noise, for air pollution, for climate, and the whole range of impacts. Is there a case that says that? Well, the case law that we cite in our brief, and I can in rebuttal give you the specific site, talk a lot about multiple project impacts. And I don't know if there's a specific case on point to that point, but the courts have been clear that the cumulative impact analysis applies to all the impact areas, and it hasn't been limited by any statute like, you know, any statutory text in NEPA or the CEQ regulation. Now before I go on to the air quality impacts as it relates to the state and federal law, I want to just highlight this weekend we had some to focus in on what happened here. As we know, NEPA is a show your work statute. You have to show that you're doing the analysis correctly. And here we have an instance where the lawyers for the federal government, the lawyers for the airport, the lawyers for the project developer were confused about what the traffic analysis showed. They showed that there's this deep inconsistency between the EA, the environmental assessment and the response to comments, and other analysis in the project. And if these very capable and smart lawyers for the federal government couldn't figure it out after years of litigation, the public can't figure it out. There are deep inconsistencies in this document, and I think we in our brief articulate that you can't use post hoc or justification and litigation briefs to make an argument or to explain an issue in a NEPA analysis. You surely can't use the 28-J letter filed the weekend before oral argument to make those arguments either. Now I want to focus in... Do you disagree with the explanation that, as I understand it, they're saying they didn't do round trips, but they did one ways two times. Do you disagree with that, that that's actually what happened? It's very unclear. I've spent a lot of time, including a lot of time, Saturday night and Sunday, digging into the record and emails back and forth. It's very unclear. I think the big point is an agency action is arbitrary and capricious if they don't show how their work has a rational basis. This is the hallmark of that. Something as central as truck trips, which formed the foundation of analysis for a freight project, it wasn't clear. There was deep inconsistencies and the government just simply didn't show its work. With that, I want to reserve the rest of my time for rebuttal, unless there are other... All right. Thank you, counsel. We'll hear from the state. Good morning, your honors. May it please the court, Yuting Xu for State of California. So in addition to the issues that my co-counsel raised about the study area and the cumulative impacts, I want to highlight at least three other inconsistencies and issues with the FAA environmental review. Each of these issues indicates arbitrary and capricious agency action under the Administrative Procedure Act. Each of them standing alone justifies vacating the FAA order approving this project. One was the FAA failed to consider evidence of significant environmental impact from a California state environmental review process known as the California Environmental Quality Act, or CEQA. Two was that the number of truck trips in the FAA's analysis is underestimated and inconsistent, which undermines the agency conclusion that there was no environmental impact. And frankly, it undermines the public trust that the agency conducted a reliable analysis. Three was that the FAA failed to analyze whether the amount of greenhouse gas generated by the project may threaten a violation of California law for the protection of the environment. Now, on the first issue of CEQA, for development projects like Eastgate, the State of Environmental Policy Act, this is CEQA. So NEPA and CEQA are separate requirements, and the CEQA process is required under state law. The NEPA process is triggered by federal law. And just like NEPA, the basic purpose of the CEQA analysis is to inform the federal decision makers, inform the government decision makers, and the public about the potential significant environmental effects of the proposed project. A finding of no significant impact... Council, under CEQA, can the California regulators order a full-blown environmental impact statement? Under CEQA, the California regulators could order an environmental impact report, which is analogous to the environmental impact statement. And did they do that here? They did prepare an environmental impact report. The analysis is documented in the environmental impact statement here. And under CEQA, so a finding of no significant impact under NEPA is what the FAA found here in the NEPA process. And as a result, they did not prepare an environmental impact statement. And under CEQA, this project proponent can issue a negative declaration only if, based on the whole record before the agency, there is no substantial evidence that the project may have significant environmental effects. And similarly... Council, are you saying that the FAA's finding was inconsistent with the finding made as a result of the state investigation? Your Honor, yes, the FAA came to the conclusion that there was not going to be any significant impacts. The state CEQA analysis found that there was going to be significant air quality, climate change, and noise impacts. And the evidence for this finding of significance was submitted in the separate NEPA process for the agency's consideration, but the agency ignored that evidence. And so it's not our position that the NEPA analysis must come to the same conclusion as CEQA analysis with regards to significance of impact. But because both processes considered the identical project and the two analysis were conducted within a few months of each other, this significant and unavoidable impact in the CEQA process raises substantial questions in the NEPA review about whether the project may have significant environmental impacts. Council, just related to that, did the California CEQA EIR find that the project would violate state law, especially with respect to greenhouse gases? Yes, the CEQA review found that, and as the FAA acknowledges in its brief, the CEQA review found that there was going to be a significant and unavoidable greenhouse gas impact in violation of both the air quality, the state air quality standards, and that it was going to exceed the greenhouse gas levels and undermine. Why couldn't they stop the project under state law then? There is a provision that requires the FAA to conduct an analysis of the airport layout plan, which is what the project is depicted in. And this airport layout plan is what the depiction of this project in the airport layout plan is what triggers this NEPA analysis. And in order for the project to begin construction, as the FAA acknowledges in its brief, construction cannot start until the FAA itself has approved the airport layout plan. Council, the state doesn't have the authority to prohibit the federal project from going forward, does it? Once the state completes its environmental review process under CEQA, if this CEQA review is inconsistent in analysis or if it doesn't pass muster, the state could decide not to approve the CEQA analysis. But the state itself does not have the authority to say that the FAA is the one who is approving this airport layout plan, which triggers the environmental review process under the federal law. So the FAA could approve the project over the objection of the state? Well, the FAA did approve the project over the objection of the state in this case, because the FAA approved the environmental assessment, which we argue is flawed. And the state's position is that the environmental review did not pass muster under NEPA. And I want to go back to highlight some of the inconsistencies that shows that the environmental review process was arbitrary and capricious. For example, the analysis of emissions from the project truck trips indicates that the truck trips are heavily discounted from the CEQA review truck trips for the identical project was presented to the agency under the NEPA analysis. And in one part of the record, the truck trips are reduced by at least 25%. And in another part of the record, the truck trips are reduced by 95%. And when these inconsistencies are brought to the FAA's attention for the public comments in the NEPA process, the FAA never adequately explained how it shows these arbitrarily discounted truck numbers. And then the FAA compounded this error by counting these trips as single trips rather than round trips, which half the number of the amount of actual emissions from the truck trips. And frankly, the FAA itself does not demonstrate confidence in these truck trip numbers because they have sometimes put forward that these numbers are round trips and sometimes claim that they are single trip calculations. So all of these inconsistency undermine public transparency and trust that the agency properly took into account the mobile source emissions of this project. And it undermines the requirement that the FAA presents a complete and accurate information and picture to the decision makers and to the public as part of the NEPA environmental process. And with the court's permission, we'd like to go to rebuttal with the rest of our time. All right. Thank you, counsel. We'll hear from the FAA. Are there two attorneys on this argument as well? Your Honor, I'm going to take 15 minutes and then intervener respondents will take five. All right. Thank you, counsel. May it please the court. Rebecca Jaffe, appearing on behalf of the Federal Aviation Administration. FAA did an extensive NEPA review in this case. It held 47-day public comment period. It held a public workshop. It held a public hearing. It issued a 223-page long environmental assessment with approximately 3,800 pages of appendices. It analyzed 847 public comments, 68 percent of which supported the project. Its analysis was reasonable and is entitled to deference. First, I want to clarify a point about the significance of the CEQA environmental impact report versus the federal environmental assessment under NEPA. And then I would like to turn to truck trips and ozone. The purpose of the CEQA report was to enable the San Bernardino International Airport to enter into a lease with Hillwood, the intervener respondent that will be speaking after me, to engage in this project. And the CEQA report also served as the basis for various necessary California agency approvals, building permits and such. And that is explained, for example, in volume four of plaintiff's excerpts of record, page 791. So the CEQA report allowed the project to move forward. After the CEQA report was issued, the San Bernardino International Airport was able to move forward with the project. So there was no state report saying this project must stop and then the federal government moving forward. Did the state have the authority to stop the project? Yes, Your Honor, I believe so. Because if there were no building permit, if there were no necessary state agency approvals, for example, for biological resources, then the state couldn't move forward. And the San Bernardino International Airport, its ownership is a little complicated to me, but it's partially a state entity. And it could not enter into the lease with Hillwood Enterprises before going through the CEQA analysis. Yeah, that's the part I don't understand. If they claim that this violates state law, why didn't the state stop it? I don't know, Your Honor, but they never challenged the CEQA analysis. They never challenged the CEQA report. They never sued the airport and said you can't move forward with this project. They never sued for any of the necessary state authorizations. Counsel, why would they challenge the CEQA report? Because that's what allowed the San Bernardino Airport to move forward with entering into a lease with Hillwood Enterprises to construct the sorting facility and to construct the parking apron. The FAA does have a role in this process as well, but if there were no state approvals, then there would be nothing for FAA to approve. So perhaps on rebuttal, we can get some clarification on that point, because my understanding was that the state did not have the authority to halt the project. So if you're saying the state has that authority, then if there were a violation of NEPA, could the lease be undone? So I think that there's an analytical jump between what are the consequences for a violation of NEPA and the lease. The FAA isn't a party to the lease. That's why the CEQA report served as the basis for the San Bernardino International Airport entering into that lease. In the normal course, if an agency's NEPA analysis is inadequate, the court can remand to the agency for further analysis. And in this case, we, of course, think the analysis was adequate. It wasn't perfect, as I acknowledged in the letter Saturday night, and I apologize for the timing of that letter. But it was sufficient. It was sufficient to satisfy the arbitrary and the court did want FAA to further examine any issues on remand, then it should do a remand without vacatur, because so much of this project has been approved by state agencies. FAA's role is to approve a modification to the airport layout plan. That's the extent of its authority here. I think it's confusing because the state of California played a role in drafting the California environmental impact report. The state of California is also a petitioner here. But the environmental impact report, the conclusion was that the San Bernardino Airport could move forward and enter into a lease with Hellwood. The conclusion of... Council, could we explore the remedy a little more? If we were to conclude that the environmental impact report was arbitrary and capricious, and that important impacts to the environment were not considered, could we enjoin the further construction and operation of the airport facilities that were approved by the FAA? Once minor clarification, Your Honor, construction is actually complete, and the certificate of occupancy will be issued sometime in the next week. But in any event... Could we enjoin the operation of the facility? Yes, Your Honor. The United States believes that the court has that power in the Ninth Circuit. We don't think the court should exercise this power here, because before issuing a remedy like that, the court should analyze what are the seriousness of the area's errors, excuse me, and what would be the disruptive consequences on remand. And here, there were some errors. We acknowledge that in terms of the agency's explanation of its analysis of truck trips. But the agency accounted for all the emissions from the truck trips in its modeling, and it ensured that this project... Council, where do we get that power? Is that from NEPA itself? The power to enjoin the use of the facility? So, it could be from the APA, and also from the review statute that applies to this action in particular, which in terms of remedy, allows the court to... Enjoin? Yeah. I have the specific language, but the court can... It's 49 USC 49110C, I believe. So, if we enjoin any further use of this airport, what happens? Just going to be a white elephant sitting out there, and nobody can use it? Is that the idea? The cargo facility, yes, it would be. But, Your Honor... All these airstrips go with the whole thing, don't they? Or is it just buildings that we're talking about? The... This project was constructed on what was previously a part of the airport that was not in use. And there's now a large sorting facility, and there's parking apron to hold 14 planes. So, the portion of the airport that was going to be used for the cargo sorting and distribution, including the planes for the cargo, would not be able to proceed. But the airport would not shut down. That is my understanding. But I do want to flag that there is a difference in the circuits on whether a NEPA violation allows a court to enjoin a non-federal actor. And that's discussed on page 63 of the United States' brief. But more importantly, I want to emphasize that the errors here do not warrant... First of all, they don't warrant granting the petitions. The NEPA regulations specifically contemplate that there may be errors, and errors that are harmless do not cause a violation of NEPA. Even if... Counsel, I was just going to say, the thing that disturbs me about this environmental assessment is that this is already one of the most polluted areas in the state. And so, to add any pollution to that area is a major event. So, what's your response to that? Do you say that it's harmless likely in terms of the air pollution in the area? I say that the errors are harmless in terms of whether they had a material impact on the agency's analysis. NEPA is a procedural statute, and it requires agencies to consider the impacts of their actions. Take a hard look. They're supposed to take a hard look at the impact. Not a cursory look, but a hard look. Yes, Your Honor, they are. And the agency did that here. Its explanation in some instances was incorrect, but it did not miss any emissions. And that's what matters when you're looking at how the pollution will impact the community, is how much emissions are there going to be. And one of the judges previously asked, how do we know that the agency calculated emissions for 192 truck trips in year one and 500 in year five? Those citations are at FAA Supplemental Excerpts of Record 12 and 14, where you can see the numbers that were input into the modeling analysis program. Counsel, if the truck trips were underestimated, in your view, would that have a significant impact on the air quality evaluation? If they had been substantially underestimated, then yes. But there is no evidence that the agency underestimated them at all. California points to the fact that the CEQA report used slightly higher numbers of truck trips, but that's not the standard. The standard isn't, did FAA's analysis come out a little bit differently than in the environmental impact report? The standard is, was FAA's analysis reasonable? And nobody has suggested that FAA's analysis, which was based on taking the number of packages that would go through the facility, dividing that by how many would fit into trucks and saying, all right, that's the number of truck trips. Nobody has said that. Didn't you use a different figure for traffic purposes than you did for emissions? And why isn't that arbitrary? That, it's the absolute opposite of arbitrary. That's exactly what FAA was required to do. As I said, the agency input the number of truck trips into the emissions model based on the package numbers. But when you look at the impacts of truck traffic, of truck trips on traffic, on intersections, on levels of service, the San Bernardino City guidelines require agencies to convert truck trips into passenger car equivalents. And that document is in the FAA Supplemental Excerpts of Record 51. And so the city itself mandates you have to use different numbers for truck trips to account for the fact that trucks are bigger, they have less acceleration, they're less maneuverable, they consume more road capacity. And the traffic analysis is separate from the air quality analysis. The purpose of the traffic analysis is to say, how will service at intersections be impacted? And for that, the agency needs to compare apples to apples. It needs to have a way of comparing truck trips to passenger cars. And that's why they use a different number when they're analyzing the impacts of truck traffic, truck trips on traffic. So we're just talking about congestion and not air quality. Yes, exactly, Your Honor. So are you saying that the FAA did not use traffic figures to calculate the air emissions? That is exactly what I'm saying. And so what was used to calculate the air emissions? The FAA used the number of truck trips based on the number of packages that the facility will process. And you can... But isn't that... So you didn't use traffic figures, you used packages to determine air emissions? So they took the number of packages and they said how many packages will fit into a truck based on average package size. It's about 1,500 packages per truck. So they divided the number of packages by 1,500, and that led them to 192 truck trips per day in year one of the project. But whether or not there are two packages in the truck or 2,000 packages in the truck, the truck is still going to emit particles into the air. So why is it the number of packages that determines how much the air emissions are going to be? It's not... The number of packages tells you how many truck trips you're going to have. And then you input that number of truck trips into the modeling program. And the agency reasonably assumed that the trailers are going to be full because that's... My understanding is that in the logistics industry, they try to maximize gas driver time and things like that. So they're moving full trailers in and out. And so when you are trying to think about how many truck trips are we going to have, you have to know how many trailers of packages do we need to move. And that's how it came to those numbers. Is it unusual for a state to object to an FAA environmental study? I don't believe so, Your Honor. I think that it's something that we see where states or municipalities object to FAA decisions or other federal agency decisions. All right. Are there any other questions for the government? All right. We'll go to Intervenor. Good morning, Your Honors. And may it please the Court. Michael Carroll with Latham & Watkins on behalf of Eastgate and the related entities. I should also mention that Sabia is represented by Cole Huber in this matter, and Ronald Scholar is available. If there are any questions that you'd like to direct to counsel for Sabia. But Eastgate's and Sabia's positions are completely aligned in this matter. We generally concur with the statements of the government with respect to the adequacy of the environmental document. I do want to hit on just a couple of additional points. First, the discussion of comparison between CEQA and NEPA. CEQA and NEPA are similar statutes in their purpose and in their process, but they are not identical. And there are very good reasons why a determination of a significant impact under CEQA does not necessarily lead to a determination of a significant impact under NEPA. They require somewhat different topics to be analyzed. The thresholds of significance are different under the two statutes. And so it is not an anomaly to have a significant impact with an EIR under CEQA and an EA under NEPA. The other thing to keep in mind is that there were years that passed between the time that the CEQA review was completed and the time the NEPA review was completed. And during that period of time, the project was refined. And much of the reductions in the truck trips are as a result of knowing more about the project and being able to be more precise about the anticipated number of trucks. Did the air quality improve during that time? Air quality did improve during that time. It didn't improve substantially. But the main point that I'm making is that the project changed over time. And that's a big part of the explanation for the lower truck trips identified in the NEPA document versus the CEQA document. The other thing that I want to touch on with respect to the trucks is this whole question about whether they should be characterized as round trips or one-way trips. As the government said, the important thing here is that every single trip to and from that facility was analyzed in the NEPA document. And it's only confusing if you assume that every trip of a loaded truck has associated with a trip of an empty truck. In other words, petitioners seem to assume that every truck that leaves that facility loaded showed up at the facility empty and that every truck that drives into that facility loaded turns around and drives out empty. But that's not the way it works. They're looking for, where are those empty truck trips? Well, there aren't any empty truck trips because the trucks come in loaded with one load and they leave with another. And so that's, and now whether you want to call that a round trip or two one-way trips, I'm not sure that it really matters that much. The point is all the trips were analyzed and petitioners are simply misunderstanding the nature of the operations. It would be highly inefficient to have empty trucks going one way or the other. So a full truck comes in, a full truck comes out. Well, the problem is we have to look to the environmental assessment to tell us that, not to the lawyers to explain to us what the environmental assessment meant. So the difficulty is that the environmental assessment does not completely explain how the truck trips were calculated. In fact, we had a 28-J on the eve of argument trying to further illuminate how that was done. So why isn't that arbitrary and capricious to not have an adequate explanation? I believe the record is clear on this point. And attached to the communication with the court yesterday was the air quality protocol that was used to estimate the air emissions. And it very clearly states that the assumptions that were used, and I should say that that protocol was submitted by the FAA to the South Coast Air Quality Management District, to the California Air Resources Board. I'm sorry, not the California Air Resources Board, but the Southern California Association of Governments and to the U.S. Environmental Protection Agency. All three of those agencies signed off on that protocol, and that is the exact protocol that was used. And it's very clear, if you read that protocol and if you read the entirety of the record, that the analysis was done correctly. And what the petitioners are pointing to is really a red herring, again, based on a misunderstanding of the nature of the operation. What about the study areas? I believe the study areas were appropriate given the nature of the topic that was being analyzed, and it makes sense to have a smaller study area when you're looking at impacts that are more localized. And it makes sense to have a much larger study area when you're looking at more regional impacts. Well, if the trucks were going to be transporting materials throughout a larger area, why wasn't that larger area included in the general study area? Well, that larger area was included for purposes of air quality impacts. So the trucks have different types of impacts, and in some cases, air quality, for example, it probably makes sense to look at a broader study area because that's a regional impact. Trucks can also have localized impacts, noise, for example, and it doesn't make any sense to look at an 11 square mile radius when you're analyzing the noise from the truck. So depending on which of the impacts from the trucks you're looking at, the EA properly used different size study areas based on that particular topic area. So is it your position that the general study area for the air quality was larger than the general study area for the noise quality? Yes. Yes. With respect to the trucks. Now, with respect to the aircraft, obviously, the noise impacts from the aircraft do potentially have a broader range. So you need to distinguish, okay, are we talking about noise? Are we talking about noise from the airplanes? Are we talking about noise from the trucks? Or are we talking- We're talking about the trucks. Missions. Yes. So- Council, you've exceeded your time. Do you want to wrap up? I would just wrap up to say that we strongly, respectfully disagree with the government regarding the authority of the court to vacate the lease. The court has authority to review federal actions. The only federal action here was the approval of the airport layout plan. If you disagree with what we're saying regarding the adequacy of the review, you certainly can take action with respect to that. The ground lease does not involve any federal actors. FAA is not involved in the ground lease at all. FAA did not approve the ground lease. And nor does FAA have authority over the construction and operation of the project. As we've discussed, those were a matter for local land use decisions. Those local land use decisions were made. The petitioners here could have challenged those decisions in court, and it would have been proper there to ask for an enjoyment of the construction or operation of the project. But that's not proper here. Because we don't have FAA project approvals in the nature of a land use approval. We have an approval in the ALP that only goes to SEBIA's eligibility for federal funding. All right. Thank you, Council. Rebuttal? Yes. I would like to address- I agree with Mr. Carroll at one point and disagree with him. In another point, I disagree with him that the EA is clear on truck trips. I agree with him that I misunderstand the math. Even using this math that we're debating at oral argument, which is the hallmark of post-hoc rationalization, the FAA put the number of packages assumed in its brief on page 53. And if you divide those numbers by 1,500 packages per truck, you don't get 190 and 500. You get dramatically different numbers. Now, I'm not saying the court needs to do this analysis. What I'm saying is the federal government needs to show their work, and there needs to be a rational basis between their work and the decision made. That's simply not the case. The second point I want to address is- adding additional truck trips, additional aircraft in an area that is one of the most polluted in the country and one of the most polluted in California is not potentially significant. I want to address the issue of CEQA versus NEPA because I think it's a little kind of confusing. They're saying we should have challenged the CEQA analysis. Why? The CEQA analysis said there was going to be a significant air quality impact, and that was on- But did it conclude that it would violate state law? Well, if you go to the excerpts of record, volume four, pages 825 and 901, the environmental impact report under state law is clear that it may potentially violate the California ambient air quality standards, which is a state standard. And the project constitutes unavoidable, adverse, significant impact for greenhouse gas emissions. So the analysis shows what we're saying here. And I want to reiterate- What about the government's- the FAA's point that if they thought- if the state regulators thought it would violate state law, why didn't they join it on- before we got to this point? I mean, a lot of the critiques in the California Environmental Quality Act were done the way we're saying should have been done in the federal law. I think the important thing is this is a NEPA case. This is a case about federal law. We're not imposing what the state requires on the federal government. Yeah, but your argument is that it violates state law. So that's what I just don't understand. If California concluded it violates state law, why didn't they stop it before we got to this point? Yeah, and I think that's the nature of these statutes. These are procedural statutes. They're a look before you leave statute. You need to analyze the environmental impacts. And the notion is that when the proper environmental analysis happens, agencies will make good decisions. Now, we end up challenging a lot of those decisions because we think the analysis is incorrect. But that's how it goes. And it's important benefits conferred here because the Federal Aviation Administration has a whole host of mitigation and other strategies identified in its desk reference to address airport impacts. And I think the key is we shouldn't conflate what state law requires with what federal law requires. And here, federal law is clear. They need to look at these state standards and whether this project interferes with meeting those. And they need to disclose that. I admit that this is what NEPA gets us is the appropriate information. And that would have been important here, especially in a project in San Bernardino, which is suffering from really bad air quality. The final point I want to address is the issue about the airport. There's still parts of the airport that will be operating. Even if this is enjoined, this is one project at that airport. All right. Thank you, counsel. Thank you to all counsel. A case just argued is submitted for decision by the court. That completes our calendar for today. We are in recess until 9 30 a.m. tomorrow morning. This court for this session now stands adjourned.
judges: Siler, Rawlinson, Bumatay